*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  January 7, 2016          520886
_____

In the Matter of PHILIP
    HAWTHORNE,
                    Respondent,

        v                                        MEMORANDUM AND ORDER

TINA M. STANFORD, as Chair
    of the New York State
    Board of Parole,
                    Appellant.
_____

Calendar Date:  November 18, 2015

Before:  Peters, P.J., Garry, Egan Jr., Rose and Devine, JJ.

_____

        Eric T. Schneiderman, Attorney General, Albany (Laura
Etlinger of counsel), for appellant.

        Gibson, Dunn & Crutcher, LLP, New York City (Darcy C.
Harris of counsel) and Jennifer J. Parish, Urban Justice Center,
New York City, for respondent.

_____

Garry, J.

        Appeals (1) from a judgment of the Supreme Court (LaBuda,
J.), entered June 18, 2014 in Sullivan County, which granted
petitioner's application, in a proceeding pursuant to CPLR
article 78, to annul a determination of the Board of Parole
denying petitioner's request for, among other things, parole
release, and (2) from a judgment of said court, entered November
6, 2014 in Sullivan County, which, upon reconsideration, adhered
to its prior decision.

In March 2009, petitioner pleaded guilty to a charge of use of a child in a sexual performance and was sentenced to a prison term of 5 to 15 years. Petitioner obtained an earned eligibility certificate during his incarceration (see Correction Law § 805), and appeared before the Board of Parole in March 2013. The Board denied release. Petitioner thereafter commenced this CPLR article 78 proceeding, challenging the Board's decision as arbitrary and capricious and alleging, in essence, that the Board had failed to consider his mental illness in the review process. Supreme Court granted the petition, directed that a de novo hearing be conducted and further required the Board to administer a COMPAS Risk and Needs Assessment instrument (hereinafter the COMPAS assessment) tailored to address petitioner's mental illness. Thereafter, the court issued a subsequent judgment denying respondent's motion for leave to reargue and renew.[1] Respondent appeals from both judgments.[2]

The Board is charged with considering whether "there is a reasonable probability that, if [an] inmate is released, he [or she] will live and remain at liberty without violating the law, and that his [or her] release is not incompatible with the welfare of society and will not so deprecate the seriousness of his [or her] crime as to undermine respect for the law"

_____

[1]  As Supreme Court's subsequent judgment addressed the underlying merits, we deem Supreme Court to have granted reargument and then adhered to its prior determination (see CPLR 5701 [a] [2] [viii]; Rodriguez v Jacoby & Myers, LLP, 126 AD3d 1183, 1184 [2015], lv denied 25 NY3d 912 [2015]).

[2]  Petitioner again appeared before the Board during the pendency of this appeal and was denied release. Both parties argue that this reappearance did not cause the appeal to be moot. We agree, finding that the exception to the mootness doctrine applies. Supreme Court's disposition required specific relief in a manner that continues to affect the parties' respective rights and will recur and evade review unless it is addressed (see Matter of Lebron v Alexander, 68 AD3d 1476, 1477 [2009]; Matter of Lovell v New York State Div. of Parole, 40 AD3d 1166, 1167 [2007]).

(Executive Law § 259-i [2] [c] [A]).  "The decision to grant parole release is discretionary, but the Board is required to consider certain guidelines in making its determination" (Matter of Hamilton v New York State Div. of Parole, 119 AD3d 1268, 1269 [2014] [citations omitted]; see Matter of Silmon v Travis, 95 NY2d 470, 477 [2000]).  These guidelines include such factors as the inmate's institutional record, his or her release plans, the seriousness of the offense, and his or her prior criminal record (see Executive Law § 259-i [2] [c] [A] [i], [iii], [vii], [viii]; 9 NYCRR 8002.3 [a] [1], [3], [7], [8]).  In 2011, the law was amended to further require that the Board's "review must include an instrument that measures rehabilitation and the likelihood of success on parole" (Matter of Montane v Evans, 116 AD3d 197, 202 [2014], lv dismissed 24 NY3d 1052 [2014]; see Executive Law §§ 259-c [4]; 259-i [2] [c]).  The Board utilizes the COMPAS assessment to satisfy this requirement (see Matter of Symes v New York State Bd. of Parole, 117 AD3d 959, 959 [2014]).

Here, it is undisputed that petitioner has a significant history of mental illness.  He has no prior history of criminal conduct.  Before committing the underlying crime, he had obtained Associate's and Bachelor's degrees, was working on obtaining a Master's degree, and had been employed as a substitute teacher and a tutor.  In the period immediately preceding the criminal conduct, he was suffering from agoraphobia related to his mental illness and had withdrawn from all activities, including work and school.[3]  His crime involved using computer communications to pose as a 16-year-old boy for the purpose of exchanging nude photos with a 13-year-old girl.  There was no physical contact between petitioner and his young victim; all of their exchanges were computer-based.  Petitioner's online conduct grew worse over time, and he ultimately threatened the victim that he would distribute and share her photos if she failed to engage in specific, exceptionally degrading conduct at his direction.

_____

[3]  The record fails to reveal where petitioner was residing at this time; there are some indications that he had been attempting to live on his own, and others that he had been residing with either his mother or his father.

In April 2009, after petitioner was committed to the custody of the Department of Corrections and Community Supervision (hereinafter DOCCS), he was given an initial psychiatric screening. He was diagnosed with schizoaffective disorder and given an Office of Mental Health service level designation of 1 – the highest level of services, indicating a diagnosis of a major mental illness and/or severe personality disorder with active symptoms. Several psychiatric medications were prescribed. Following his transfer several months later to the Midstate Correctional Facility, his mental health level was downgraded to service level 2, and he was placed in the general population. In October 2009, his mental health level was again downgraded, to service level 3, which indicates a need for short-term psychiatric medication for relatively minor disorders. In January 2010, a physician at Midstate determined that petitioner no longer required any psychiatric medications. Following the discontinuance of his medication, petitioner became actively psychotic, lost 40 pounds and stopped attending to basic hygiene. Petitioner's mother, who had maintained regular and frequent contact during his incarceration, noticed the changes almost immediately. She wrote a series of urgent letters describing petitioner's deteriorating mental health and pleading for appropriate treatment, but these letters did not apparently generate any timely response. Petitioner was ultimately reevaluated in March 2010, by which time he had been placed in the special housing unit (hereinafter SHU) as a result of disciplinary incidents. Upon reevaluation, he was found to meet the criteria for "serious mental illness," which entitled him to receive out-of-cell mental health treatment while confined in the SHU.[4] His mental health level was raised, his medications were reinstated, and he was placed in therapeutic housing facilities.

There are five disciplinary violations in petitioner's record that arose within the four months immediately following

_____

    [4] The legislation that now requires prisoners who are determined to have serious mental illness to be diverted from the SHU into residential mental health treatment had not yet taken effect (see Correction Law § 137 [6] [d] [i], as added by L 2008, ch 1, §§ 4, 8 [a]).

the discontinuance of his psychiatric medication.  The offenses charged included refusing to obey direct orders, creating a disturbance and engaging in violent conduct.  The most grave charges, of violent conduct, arose from an incident in which he struck and kicked correction officers as they attempted to restrain him; on another occasion he refused to enter his cell and lay on the floor until officers moved him, and a third incident arose when he hid under his bed and refused to come out until he was physically removed.  Outside of the four months in which he was not treated for his mental illness, petitioner has maintained an almost-perfect disciplinary record, incurring only one tier II disciplinary infraction in July 2011 for being "out of place," apparently resulting from his mistaken belief that he was scheduled to attend a meeting.  Overall, following the reinstatement of appropriate treatment and medication, the record reveals that petitioner has functioned very well.

The therapy reports in the record indicate that petitioner has accepted responsibility for his criminal conduct and understands that he must continue to address the conditions that led to this conduct.  His participation in programming has been described as "excellent," "exceptional" and "outstanding."  He has served as a group leader and was described by the supervisor of a behavior modification group as an "asset to the program and to his peers."  He has expressed remorse for the harm he caused to the young victim.  In the course of the parole interview, petitioner described his criminal conduct as "a disgusting thing."  The record further reveals that petitioner has substantial community and family support in place to aid his re-entry upon his eventual release from incarceration.  There are identified resources for obtaining housing and employment, and the Urban Justice Center, which has worked with him for several years, has agreed to provide social work and assist his enrollment in continuing mental health and rehabilitation treatment services.

Prior to petitioner's appearance before the Board, a COMPAS assessment was prepared (see Executive Law § 259-c [4]).  This instrument, consisting of 74 questions, indicated that petitioner was at a low risk of arrest (2 out of 10), or absconding (1 out of 10), and was unlikely to engage in re-entry substance abuse (1

out of 10).  He scored low (3 out of 10) for history of violence, but in the medium range for risk of felony violence (7 out of 10).  He scored high for prison misconduct (10 out of 10).  The Board members reviewed this instrument at the outset of petitioner's interview, and then conducted a fairly comprehensive colloquoy with him addressing various factors, specifically including a review of his prison disciplinary history.

In its determination, the Board acknowledged several positive factors, including petitioner's programming and community support, and stated that it had taken his mental illness into account, but relied upon his crime and his disciplinary history in denying release.  After discussing petitioner's crime, the Board wrote, "Your poor behavior is noted and remains disturbing.  While your mental health needs at the time are considered, your conduct in a structured environment has been marginal.  Due to your deviant actions with a child, and marginal compliance with DOCCS rules, your release at this time is denied[.]  There is a reasonable probability you would not live and remain at liberty without violating the law."

We agree with respondent that the record does not support petitioner's assertion that the Board relied solely or primarily upon the COMPAS assessment in reaching its determination.  Indeed, some of the discussion within the hearing transcript suggests that the COMPAS assessment may even have been discounted to some degree.  Nonetheless, it is clear that the determination strongly relied upon, and even emphasized, petitioner's disciplinary history.  In this regard, the determination lacks record support.  Other than the disciplinary issues that arose when petitioner's illness was untreated, there is simply no record basis for finding that petitioner's "conduct in a structured environment has been marginal" or that there was "marginal compliance with DOCCS rules."  Only during the period when petitioner was deprived of medication for his mental illness – not through his own fault, but as the result of a medical decision imposed upon him by a prison physician – did petitioner repeatedly fail to comply with prison rules.  The Board failed to acknowledge this critical fact, noting that it had taken petitioner's mental illness into account but failing to address the fact that most of the infractions that it found "disturbing"

occurred while this illness was not being treated.

Considering this factual background, we agree with Supreme Court that the Board's determination was irrational (see Matter of Comfort v New York State Bd. of Parole, 101 AD3d 1450, 1451 [2012]). Further, it was irrational to such a degree that it cannot withstand judicial scrutiny, despite the very limited scope of our review (see Executive Law § 259-i [5]; Matter of Hamilton v New York State Div. of Parole, 119 AD3d at 1269). As petitioner argues, a fair review of this record compels the conclusion that the determination to remove him from all medication for his mental illness led to a psychotic breakdown that rendered him unable to comply with prison regulations during the period when the disciplinary infractions occurred. To withhold petitioner's necessary medications was apparently an error of medical judgment. However, for the Board to then rely upon petitioner's conduct during the psychotic crisis that was thus precipitated as a primary ground for denying his release is so inherently unfair and unreasonable that it meets the high standard of "irrationality bordering on impropriety" warranting our intervention (Matter of Russo v New York State Bd. of Parole, 50 NY2d 69, 77 [1980]). To hold otherwise would, in effect, result in punishing petitioner with continued incarceration for the failure of prison officials to provide him with proper treatment for his mental illness – a result that we cannot sanction. Accordingly, we agree with Supreme Court that petitioner must be afforded a de novo hearing before the Board.

In reversing the Board's determination, Supreme Court found that the COMPAS assessment utilized by the Board was inadequate for use with inmates exhibiting mental illness and directed the Board to prepare a COMPAS assessment that has been "tailored" to address petitioner's mental health needs.[5] We agree with respondent that the court erred in this regard. As respondent

_____

[5] There are apparently multiple versions of the COMPAS assessment available; respondent argues that this issue was not properly preserved, but we note that within petitioner's initial administrative appeal, he asserted that a 95-question version is routinely utilized by probation departments throughout the state.

asserts, courts do not have power to substitute their judgment for that of the Board; the scope of judicial review and direction is limited.  The legislation that required the Board to utilize a risk and needs assessment did not deprive it of discretion in determining how to fulfill this requirement (see Executive Law § 259-c [4]; Matter of Montane v Evans, 116 AD3d at 201-202; see generally People ex rel. Donohoe v Montanye, 35 NY2d 221, 226-227 [1974]).  The court's specific findings and directions pertaining to the COMPAS assessment exceeded the scope of its authority and must be reversed.  We need not reach the issue of whether compliance with the court's directive is feasible.

Peters, P.J., Egan Jr., Rose and Devine, JJ., concur.

ORDERED that the judgments are modified, on the law, without costs, by reversing so much thereof as directed the Board of Parole to administer and prepare an alternative COMPAS Risk and Needs Assessment instrument, and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court